UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
LISA M. O'ROURKE                        )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )     C.A. No. 16-626 WES
                                        )
TIFFANY AND COMPANY,                    )
                                        )
          Defendant.                    )
_____ )

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

     This employment discrimination action stems from the termination of Plaintiff Lisa M. O'Rourke from Defendant Tiffany and Company ("Tiffany"). Currently before the Court is Defendant's Motion for Summary Judgment, ECF No. 34. Defendant argues that it is entitled to summary judgment on all three claims advanced by Plaintiff in the Amended Complaint ("Am. Compl."), ECF No. 32. For the reasons that follow, Defendant's Motion for Summary Judgment is GRANTED.

I.   Background and Travel

     Plaintiff began her employment with Tiffany in 2010 at its manufacturing facility in Cumberland, Rhode Island. Def.'s Statement of Undisputed Facts ("Def.'s SUF") ¶ 1, ECF No. 35. By 2014, Plaintiff was promoted to Director of Purchasing and Planning, in which capacity she supervised nineteen employees and

performed purchasing, planning, and sourcing duties.  Id. ¶¶ 2-3.

While in that position, Plaintiff reported to the Group Director

of Purchasing and Planning, Mary Messier.  Id. ¶ 4.

A.  BRCA2 Diagnosis and First Leave

Three years after beginning her employment at Tiffany,

Plaintiff learned that she was a carrier of the BRCA2 gene

mutation.[1]  Id. ¶ 15.  To mitigate the risk associated with being

a carrier of that gene mutation, Plaintiff underwent two surgeries

in the early part of 2014, for which she took a leave of absence

from Tiffany ("First Leave").  Id. ¶ 16. Plaintiff's First Leave

lasted seventeen weeks, from January 13, 2014, through May 12,

2014.  Id.  The first twelve weeks of that leave were covered under

the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq.

Plaintiff and Messier had a friendly relationship while they

worked together at Tiffany and kept in contact during Plaintiff's

First Leave. Id. ¶ 18.  According to her deposition testimony, at

some point during the First Leave, Plaintiff felt some pressure

from Messier to return to work after Messier brought up another

---

[1] Mutations of the BRCA2 gene correlate with an increased risk of certain cancers, namely breast and ovarian cancer.  Such mutations are often hereditary.  A mutation of the BRCA2 gene is not a cancer diagnosis, nor does it mean that the patient will ultimately develop cancer; it indicates only that the patient has a higher-than-average risk of developing cancer. See BRCA gene test for breast and ovarian cancer risk, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/brca-gene-test/about/pac-20384815 (last visited March 26, 2020).

Tiffany employee who underwent a similar procedure and had returned to work.  Id.  Plaintiff reached out to a colleague about these concerns, and ultimately determined that she may have been "overthink[ing]" her conversation with Messier.  Id. ¶ 19.

Additionally, while Plaintiff was out on her First Leave, Tiffany hired Wayne Howard ("Howard") to serve as Vice President of Manufacturing, a position two levels above Plaintiff's position.[2]  Id. ¶¶ 7, 9.  Howard began his tenure with the company in January 2014, and in his role managed 800 to 900 employees scattered across Tiffany's various manufacturing facilities.[3]  Id. ¶¶ 7-8.  Howard was aware that Plaintiff had taken a leave of absence for medical reasons.  Plaintiff's Statement of Disputed Facts/Obj. to Def.'s Statement of Undisputed Facts ("Pl.'s SDF") ¶ 26, ECF No. 39-1; see Def.'s SUF Ex. K, at 2, ECF No. 35-11.

B.  Return to Work after First Leave and 2013 Performance Evaluation

Plaintiff returned to work in May 2014 without any medical restrictions or accommodations.  Def.'s SUF ¶ 28.  Not long after her return, Plaintiff hired a new employee, Ricky Martin, to fill a position under her supervision which had been vacant for over a year.  Id. ¶ 33.  Martin quit just two weeks after he started,

---

[2] Messier reported directly to Howard.  Def.'s SUF ¶ 9.
[3] According to Plaintiff, she had minimal, monthly interaction with Howard, rarely face-to-face.  Id. ¶ 10.

3

leaving "negative feedback" about Plaintiff upon his exit.  Id. ¶
34; Pl.'s SDF ¶ 34.

Soon thereafter, in June 2014, Howard began to question
Plaintiff's performance.  Def.'s SUF ¶¶ 35-36.  Part of Howard's
concern stemmed from the circumstances of Martin's departure.  Id.
¶ 34; Pl.'s SDF ¶ 34.  Additionally, Howard identified Tiffany's
planning function, overseen by Messier and Plaintiff, to be an
area of weakness for the company.  Def.'s SUF ¶ 30.  Howard's
concerns came to light through discussion of Plaintiff's 2013
performance review in an email to his supervisor on June 10, 2014.[4]
Id. ¶ 36.  The email reads, in pertinent part:

> Lisa was out on medical leave since I started, only
> returning the week that you, Ralph and I went to
> [Tiffany's Rhode Island facility].  Based on [Messier's]
> review, she rated Lisa as a 5, for 2013 and recommended
> relevant bonus and increase when we were doing
> performance reviews.
>
> I haven 't [sic] worked with Lisa yet, but based on what
> we have seen with planning, and the recent quick turnover
> of Ricky Martin, there are issues in my mind. However,
> I wasn't here in 2013 so I don't want to be unfair, and
> planned to evaluate her performance over the next few

---

[4] Tiffany uses a yearly two-level performance evaluation
system in which each employee is initially evaluated by his or her
direct supervisor and rated on a scale of one to six, where "1"
signifies "unsatisfactory" performance and "6" signifies
"outstanding" performance.  Def.'s SUF Ex. B, at 46, ECF No. 35-
2.  That evaluation is then passed up to another supervisor, who
determines whether the initial evaluation needs to be adjusted to
account for any perceived performance issues.  See Def.'s SUF ¶¶
68-70.  Supervisor evaluation scores are one of several data inputs
that influence an employee's annual bonus and merit raise increase.
See id. ¶¶ 133-141.

months.  Unfortunately, I heard last week that she will
be out again in July for up to 6 weeks.

So, my thought was to sign the forms and speak to
[Messier] about carefully evaluating her performance.

Def.'s SUF Ex. K, at 2.  Despite Howard's questions, Plaintiff
received an evaluation score of "5"[5] for the calendar year 2013
and 100% of the bonus for which she was eligible that year.  Def.'s
SUF ¶¶ 42, 138.

C.  Plaintiff's Second Leave

In July 2014, Plaintiff planned to take another leave from
Tiffany for follow-up reconstructive surgery.  Id. ¶ 43.  Around
July 10, 2014, Plaintiff put in a request with Tiffany's third-
party leave administrator, Matrix Absence Management ("Matrix").
Id. ¶ 44.  Matrix denied Plaintiff's leave request because she had
exhausted her FMLA entitlement for the year during her First Leave.
Def.'s SUF Ex. M, ECF No. 35-13.  Former Tiffany Human Resources
Manager Karen Curtis discussed the denial with Plaintiff and
suggested that Plaintiff could use vacation time or reschedule her
procedure to ensure that her job was protected.  Def.'s SUF ¶ 46;
Def.'s SUF Ex. I, at 27:8-13, ECF No. 35-9; Pl.'s SDF ¶ 46.
Plaintiff declined that suggestion because she planned to use her
vacation time later that year for a family trip.  Def.'s SUF ¶ 47.

After speaking with Curtis and following up with Messier,

---

[5] A "5" rating under Tiffany's metrics means that the employee
"frequently exceeded expectations."  Def.'s SUF ¶ 67.

Plaintiff contacted Philip Gajdjis, Senior Director of Human Resources, Jewelry and Diamond Supply. Id. ¶¶ 48-49. Plaintiff discussed with Gajdjis her belief that she was being treated differently than another manufacturing employee whose leave had been approved when that employee had already exhausted the FMLA entitlement. Id. ¶ 49. Gajdjis approved Plaintiff's leave later that day and informed Plaintiff that her job would be protected in her absence.[6] Id. ¶¶ 50-51. Plaintiff began her second leave ("Second Leave") on July 17, 2014 and returned to work without medical restrictions or accommodations on August 10, 2014. Id. ¶¶ 54-55. According to Howard, he was aware that Plaintiff took a second leave of absence but did not know the circumstances surrounding that leave. Id. ¶ 53; Def.'s SUF Ex. C, at 83:17-84:9, ECF No. 35-3.

D. First Company Reorganization and 2014 Performance Evaluation

By the end of 2014, Howard began a reorganization process to address the deficiencies he perceived in the company's planning function. Def.'s SUF ¶ 58. Pursuant to this restructure, he changed Plaintiff's title from Director of Purchasing and Planning

---

[6] Following Plaintiff's call, Gajdjis contacted Matrix to inquire about Plaintiff's FMLA status and whether the surgery for which she requested leave was elective. Def.'s SUF Ex. E, at 18, ECF No. 35-5. Plaintiff testified in her deposition that Gajdjis's inquiry into the elective nature of her procedure was "disgusting." Def.'s SUF ¶ 146.

to Director of Strategic Sourcing; Plaintiff supervised two buyer positions and continued to report to Messier, who also filled a new position.  Id. ¶ 59.  With planning responsibilities shifted to a new hire, Plaintiff was tasked with "strategic procurement of capital equipment, metals and materials."  Id.  In addition to creating these new roles, Tiffany worked in conjunction with outside consultants to perform a three to four month long strategic sourcing exercise.  Id. ¶ 63.  Plaintiff felt "optimistic" about her new position and initially considered it to be a promotion. Id. ¶¶ 65-66.

The next issue arose over Plaintiff's performance review for the 2014 year.  Messier initially rated Plaintiff's performance as a "5".  Id. ¶ 67.  Howard met this evaluation with skepticism on his second-level review.  Id. ¶ 68.  In an email to Messier on March 2, 2015, Howard questioned:

> [F]or Lisa, are you absolutely convinced that she was a 5 last year? It seems that there were inventory issues throughout the year, planning issues with the DR, management issues with her new hire and direct reports. I thought she was more likely a 4.[7]

Def.'s SUF Ex. J, at 4, ECF No. 35-10.  When Messier responded, she agreed that there had been inventory issues as well as management issues with Martin, but appeared to defend Plaintiff, stating that Martin had been "very unprofessional" and was "not .

_____

[7] A "4" rating means that an employee always meets and sometimes exceeds expectations.  Def.'s SUF ¶ 68.

. . . fit for the position." Id. at 3-4. Ultimately, after more back-and-forth, Messier stated that Howard's assessment was not unfair and she revised Plaintiff's evaluation to reflect a "4" rating. Id. at 3; Def.'s SUF ¶¶ 72-74. Plaintiff viewed this change as a "setup" designed to "push[]" her out of Tiffany. Def.'s SUF ¶ 75; Def.'s SUF Ex. H, at 9:5-11, ECF No. 35-8. She also noted this change "affected [her] salary and [her] bonus" and felt it was not "an accurate reflection of [her] performance." Def.'s SUF Ex. H, at 9:9-11.

Around the same time as the discussion of Plaintiff's 2014 evaluation, Howard began to hold bi-monthly meetings with certain employees on his team. Id. ¶ 76. Plaintiff communicated to Messier that she felt she was being singled out by not receiving an invitation to these meetings.[8] Id. ¶ 79. After learning this information, Howard invited Plaintiff to future meetings. Id.

E.   2015 Reorganization and Elimination of Plaintiff's Position

By the fall of 2015, Howard planned to further restructure Plaintiff's department. Id. ¶ 85. Under the proposed plan,

---

[8] There is some dispute between the parties as to who the meetings were intended to include and whether Plaintiff's direct reports were invited. Def.'s SUF ¶¶ 77-83. According to Howard, his "direct reports" and other employees, as needed, were invited. Id. ¶ 77. Plaintiff, however, disputes this fact and believed that she was the only director excluded from these meetings, and that her direct reports were included. Id. ¶ 80-83; Pl.'s SDF ¶ 80-83.

Messier would be reassigned the two positions supervised by Plaintiff, and the company would add a non-director position to be filled by a person with strategic sourcing experience. Def.'s SUF ¶ 87. Plaintiff's position would be eliminated. Id. On October 7, 2015, Howard emailed Gajdjis and another employee to inform them of the new organization and his recommendation that Tiffany offer Plaintiff a severance package. Id. ¶ 88; Def.'s SUF Ex. E, at 16, Ex. 2 to Gajdjis Dep.

On October 9, 2015 – two days after Howard sent the email announcing his decision to eliminate Plaintiff's position – Plaintiff emailed the Human Resources department to inform them of her intention to take another FMLA leave in 2016 to address complications from her prior surgeries. Def.'s SUF ¶¶ 93-95. About a year before her email to Human Resources, Plaintiff had told Messier that it was possible she would need further surgery. Id. ¶ 95. At the end of September or beginning of October 2015, Plaintiff confirmed to Messier that she would need to take a short leave in 2016 for this purpose. Id. In her deposition, Messier testified that she did not discuss Plaintiff's intent to take leave in 2016 with anyone at Tiffany prior to Plaintiff's email to Human Resources.[9] Id. ¶ 98; Def.'s Resp. to Pl.'s Suppl. Facts ¶ 165,

---

[9] Plaintiff also told another former Tiffany Human Resources employee about her planned 2016 leave and procedure, describing that conversation as "personal" in nature. Def.'s SUF ¶ 96.

ECF No. 49. Likewise, Howard denies knowledge of this information prior to his decision to restructure and eliminate Plaintiff's position. Def.'s SUF ¶ 98.

After learning about Howard's reorganization plan, hearing about Plaintiff's intent to take a medical leave of absence in 2016, and consulting with legal counsel, Gajdjis suggested to Howard that he offer Plaintiff the lower-level position that was being added to Messier's group as part of the reorganization process, rather than offering a severance package. Id. ¶ 100. Gajdjis justified this suggestion based on his professional opinion that it is better to "repurpose talent than to hire from the outside" and that Plaintiff was qualified to fill the lower-level role. Id. ¶ 104. Howard agreed to offer Plaintiff the lower-level position.[10] Id. ¶ 105.

On November 10, 2015, at Howard's instruction, Messier informed Plaintiff that her position was being eliminated and offered her two options: (1) take the newly-created, lower-level position or (2) accept the standard severance package. Id. ¶ 107.

---

Plaintiff is not aware whether that person shared the information with anyone else. Id. ¶ 97.

[10] There was a substantial difference in salary between Plaintiff's position prior to restructure and the lower-level position offered to her. As the Director of Strategic Sourcing, Plaintiff earned $127,316.80, with a 15% bonus opportunity and $25,000 annual award of restricted stock. Id. ¶ 103. In the new role offered to her, Plaintiff would have earned a $90,000 salary with no bonus opportunity. Id. ¶ 101.

Plaintiff rejected both options and her employment officially terminated on November 13, 2015. Id. ¶ 108. Despite her rejection of the severance, Tiffany paid Plaintiff the standard severance package. Id. ¶ 109.

After Plaintiff departed, Tiffany never re-added another Director-level position to Messier's team at the Cumberland facility, nor did it fill the position offered to Plaintiff. Id. ¶¶ 112-114; Pl.'s Suppl. Statement of Facts ¶ 154, ECF No. 46. Tiffany did create new roles in strategic sourcing, both of which are New York-based, neither of which is a Director-level position, and neither of which reports to Messier. Def.'s SUF ¶¶ 112-114. Overall, Tiffany eliminated three director-level positions at the Cumberland facility between 2015 and 2016; Plaintiff testified that she was aware of more than ten position eliminations at the Cumberland facility between 2014 and 2015. Id. ¶¶ 117-119. Plaintiff's position was the only one terminated in Tiffany's "sourcing" area.[11] Pl.'s Suppl. Statement of Facts ¶ 149.

F. Travel of the Case

Plaintiff filed this action on November 18, 2016, alleging Defendant violated the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et seq. See Compl. ¶ 17, ECF No. 1. She

---

[11] At the time of the position elimination, the sourcing department at the Cumberland facility consisted of only Plaintiff, Messier, and one lower level employee. Def.'s Resp. to Pl.'s Suppl. Facts ¶ 149, ECF No. 49.

later amended her Complaint to include two federal claims: (1) disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and (2) retaliation in violation of the FMLA, 29 U.S.C. § 2601 et seq. See Am. Compl. ¶¶ 25, 28.  Defendant filed a motion for summary judgment on all counts.  See Mot. Summ. J., ECF No. 34.

II.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute is 'one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party.'"  Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  Moreover, "[f]acts are material when they have the potential to affect the outcome of the suit under the applicable law."  Id. (quoting Cherkaoiu v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quotation marks omitted).  "[T]he burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe" rests on the non-movant.  Miceli v. JetBlue Airways Corp., 914 F.3d 73, 81 (1st Cir. 2019) (quoting Mulvihill v. Top-Flite Golf Co., 335 F.3d 15,

19 (1st Cir. 2003)).

III. Discussion

Because Plaintiff has not proffered direct evidence of discrimination, both the disability discrimination claims and the FMLA retaliation claim are analyzed under the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973).[12] See Flaherty, 946 F.3d at 53 (applying McDonnell Douglas framework to ADA claims); Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998) ("[W]hen there is no direct evidence of discrimination, the McDonnell Douglas burden-shifting framework applies to claims that an employee was discriminated against for availing himself of FMLA-protected rights.") Under this standard, a plaintiff must first establish a prima facie showing of discrimination. Webber v. Int'l Paper Co., 417 F.3d 229, 234 (1st Cir. 2005). "Once the plaintiff succeeds in establishing a prima facie case, his [or her] employer must shoulder the burden to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination." Id.

---

[12] Plaintiff's state RIFEPA claim is analyzed under the ADA analytical framework. See Deighan v. SuperMedia LLC, C.A. No. 14-264 S, 2016 WL 6988813, at *8 (D.R.I. Nov. 29, 2016). The RIFEPA bars an employer from "discharg[ing] an employee or discriminat[ing] against him or her" on the basis of "disability." R.I. Gen. Laws § 28-5-7(1). Similarly, the ADA prevents an employer from discriminating against or terminating an employee on the basis of disability. 42 U.S.C. § 12112(a).

If the employer satisfies this burden, the plaintiff "bear[s] the ultimate burden of adducing sufficient evidence from which a factfinder rationally might infer that the employer's articulated reason is a pretext for discrimination, and that the real reason for the termination was discriminatory animus." Id.

Defendant challenges Plaintiff's ability to carry either of her burdens under the McDonnell Douglas framework. The Court discusses each argument in turn.

A. Disability Discrimination (Counts I & III)

For Plaintiff to establish a prima facie case of disability discrimination, she must demonstrate that she "(1) was disabled within the meaning of the ADA, (2) was a 'qualified individual,' and (3) was discharged in whole or in part because of [her] disability." Flaherty, 946 F.3d at 53.

Defendant attacks the first and third prongs of the prima facie disability discrimination analysis. Specifically, Defendant contends that: (1) Plaintiff cannot demonstrate that she was disabled at the time the company decided to eliminate her position and (2) even if Plaintiff was disabled, she cannot connect her disability to her termination because Howard, the ultimate decision-maker, was not aware of her specific disability. Def.'s Mem. in Supp. of Summ. J. ("Def.'s Mem.") 15, ECF No. 34-1.

As to the first prong, Plaintiff argues that she is disabled under the meaning of the statutes because she has suffered a

14

permanent "anatomical loss" as a result of the preventative
surgeries to alleviate the risk posed by her BRCA2 gene mutation
diagnosis, permanently affecting her reproductive system.[13]  Pl.'s
Obj./Resp. in Opp'n to Summ. J. ("Pl.'s Obj.") 20-22, ECF No. 36.
It is unclear whether an individual who has a genetic
predisposition (i.e., the BRCA2 gene mutation) for a qualifying
disability (i.e., breast cancer), but who is asymptomatic,
qualifies as "disabled" under the ADA.  This appears to be a novel
issue courts have not yet addressed.  This Court need not reach
the question, however, because Plaintiff's prima facie case fails
at the third prong.

Under the third part of the prima facie analysis, Plaintiff

_____

[13] A person is considered disabled within the confines of the
ADA "if she (a) has a physical or mental impairment that
substantially limits one or more of her major life activities; (b)
has a record of such an impairment; or (c) is regarded as having
such an impairment." Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d
76, 82 (1st Cir. 2008); see 42 U.S.C. § 12102.  Equal Employment
Opportunity Commission regulations define a physical or mental
impairment as "[a]ny physiological disorder or condition, cosmetic
disfigurement, or anatomical loss affecting one or more body
systems, such as neurological, musculoskeletal, special sense
organs, respiratory (including speech organs), cardiovascular,
reproductive, digestive, genitourinary, immune, circulatory,
hemic, lymphatic, skin, and endocrine[.]"   29 C.F.R. §
1630.2(h)(1).  Plaintiff's Amended Complaint is arguably deficient
with respect to setting forth Plaintiff's disability, as it only
states that Plaintiff has been diagnosed with the BRCA2 gene
mutation and that she had preventative surgery to mitigate the
associated risk. Am. Compl. ¶ 10.  The Amended Complaint does not
contain any specific allegations as to the substantial limitation
on one or more life activity.  See generally id.  Plaintiff has
fleshed out this argument more fully in her briefing and argument.

must put forth evidence that she was "discharged in whole or in part because of [her] disability." Flaherty, 946 F.3d at 53. A critical piece of this causal nexus is that the decision-maker has knowledge of an employee's disability prior to discharge. Boadi v. Ctr. for Human Dev., Inc., 239 F. Supp. 3d 333, 350-51 (D. Mass. 2017); see also Tennial v. United Parcel Serv., Inc., 840 F.3d 292, 306 (6th Cir. 2016) ("An employee cannot be subject to an adverse employment action based on his disability unless the individual decisionmaker responsible for his demotion has knowledge of that disability.").

Although an employee need not tell the employer of her disability, there must be sufficient information available for the decision-maker to glean that the employee suffers from a disability. See Boadi, 239 F. Supp. 3d at 351 ("For purposes of the ADA . . . employers can become aware of an employee's condition indirectly, such as through observation of the employee's behavior, a third party's report, or the employee's description of his or her condition.") (citations omitted); Echevarria v. AstraZeneca, LP, 133 F. Supp. 3d 372, 392 (D.P.R. 2015) ("Knowing that an employee has health problems is not the same as knowing that the employee suffers from a disability.").

Plaintiff contends that a question of fact exists as to whether Howard had knowledge of her disability. Pl.'s Obj. 22-23. The Court disagrees. First, it is clear that Howard was the

ultimate decision-maker.[14]  Second, Howard expressly testified that

he had no knowledge that Plaintiff was a carrier of the BRCA2 gene

mutation while they worked together.  Def.'s SUF ¶ 91; Def.'s SUF

Ex. C, at 64:22-65:21, 66:15-67:1-6.  More specifically, Howard

testified that he knew Plaintiff had exercised her FMLA rights for

"a medical health issue" but that he "didn't know the specifics"

until he read about it in the news. Def.'s SUF Ex. C, at 16:3-12,

17:2-13.

Plaintiff "disputes" Howard's ignorance, arguing that a jury

could infer he had knowledge of her alleged disability from the

fact that she told Messier, other employees at Tiffany, and Matrix

about her condition, and they could have told Howard.  See Pl.'s

Obj. 22-23.  To demonstrate that a jury could infer Howard "was

indeed aware of [her] disability when he formulated his plan to

terminate her," Plaintiff points to the following:  a "trail of

conference calls"; "multiple emails involving Tiffany personnel

obsessing over [her] second leave request"; Howard's June 10, 2014

email characterizing her Second Leave as "unfortunate[]"; and

emails between Matrix personnel and Gajdjis stating that

Plaintiff's second request for medical leave was to undergo surgery

_____

[14] Although Howard elicited input from Human Resources, he
testified that he had final say on reorganization decisions, and
specifically, elimination of Plaintiff's position. Def.'s SUF Ex.
C, at 19:5-20, 21:4-23, 31:1-4.

"which may be elective." Id.

Even in the light most favorable to Plaintiff, these facts taken together are not sufficient to "dispute" Howard's ignorance about her alleged disability – at most, they indicate that Howard and other Tiffany personnel were aware that Plaintiff had requested FMLA leave for "medical" reasons. Moreover, the person with specific knowledge of Plaintiff's medical condition — Messier — testified that she did not discuss the specific reason for Plaintiff's leaves of absence with her superiors. See Def.'s SUF Ex. B, at 178:17-20.

Accordingly, Plaintiff's claim for disability discrimination under the ADA (and, by extension, RIFEPA) fails at the prima facie stage.

B. FMLA Retaliation (Count II)

1. Statute of Limitations

Defendant first argues that Plaintiff's FMLA retaliation claim based on her First Leave in 2014 is barred by the two-year statute of limitations set forth in 29 U.S.C. § 2617(c)(1).[15]

_____

[15] Defendant initially objected to Plaintiff's amendment of her Complaint on several grounds, including timeliness. See generally Def.'s Resp. in Opp. to Pl.'s Mot. to Amend, ECF No. 24. Although Magistrate Judge Sullivan allowed Plaintiff to amend her Complaint, she noted that Plaintiff's added FMLA retaliation claim was "both legally and factually new" and expressly stated that Defendant's ability to raise the statute of limitations defense was not affected by her order allowing amendment. See May 23, 2018 Text Order.

Def.'s Mem. 19.  Plaintiff concedes that this claim was added more than two years after her termination, but argues that it is not barred because it relates back to the same set of facts alleged in her initial pleading.  Pl.'s Obj. 5.  "Under the doctrine of relation back, an amended complaint can be treated, for purposes of the statute of limitations, as having been filed on the date of the original complaint."  <u>Pessotti v. Eagle Mfg. Co.</u>, 946 F.2d 974, 975 (1st Cir. 1991).  Relation back occurs when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

Here, Plaintiff's claim arguably depends on factual allegations asserted for the first time in the Amended Complaint.  <u>See</u> Am. Compl. ¶¶ 12-13.  However, in her initial Complaint, Plaintiff referenced her First Leave in 2014 and the fact that she had exhausted her FMLA entitlement during that year.  Compl. ¶¶ 10-11.  Plaintiff also alleged that she was terminated in 2015.  <u>Id.</u> ¶ 13.  Although a close call, the Court finds that Plaintiff's retaliation claim based on her 2014 FMLA leave sufficiently relates back to the initial pleading because it stems from the same set of core facts, and is therefore not barred by the two-year statute of limitations.

2. Prima Facie Case

For a plaintiff to make out a prima facie case of retaliation

under the FMLA, she must show that she: (1) "availed herself of a protected FMLA right"; (2) "was adversely affected by an employment decision"; and (3) can establish a "causal connection between [her] protected conduct and the adverse employment action." <u>Carrero-Ojeda v. Autoridad de Energía Eléctrica</u>, 755 F.3d 711, 719 (1st Cir. 2014) (citation and quotation marks omitted).

The first two elements of the prima facie FMLA retaliation claim are not at issue.[16] Therefore, the crux of the analysis with respect to this claim relates to whether there is a causal connection between Plaintiff's 2014 leave and her 2015 termination.[17]

At the outset of this causation analysis, the parties dispute

_____

[16] It is undisputed that at least part of Plaintiff's First Leave in 2014 was covered under FMLA. Def.'s SUF ¶¶ 16-17. It is further undisputed that Plaintiff was discharged in November 2015. <u>Id.</u> ¶ 108.

[17] Although there is much mention of Plaintiff's second 2014 leave, it does not factor into the Court's analysis of this prima facie claim. Two facts regarding Plaintiff's Second Leave are undisputed: (1) Plaintiff had already exhausted her FMLA entitlement for the year during the First Leave and (2) Plaintiff took her Second Leave and returned to work without issue for over a year. <u>See</u> <u>Valdez v. McGill</u>, 462 Fed. Appx 814, 822-23 (10th Cir. 2012) (holding that there can be no cognizable claim for FMLA retaliation or interference where an employee has exhausted his or her FMLA leave because, in such situation, the employee cannot establish the first prong of his or her prima facie case, i.e., that he or she engaged in a "protected activity")

Similarly, Plaintiff's October 9, 2015, request for a third leave to take place in 2016 cannot form the basis for a retaliation claim. It is undisputed that Howard indicated his intent to terminate plaintiff two days <u>prior</u> to Plaintiff's FMLA request. Def.'s SUF ¶¶ 88, 93. Furthermore, although Messier may have learned that Plaintiff needed to take FMLA leave in 2016 for

whether a "but-for" or "negative factor" standard should apply. See Pl.'s Obj. 9; Def.'s Reply 4-5, ECF No. 37. The First Circuit has not yet clearly answered this question. Limoli v. Delta Air Lines, Inc., No. 18-cv-10561-FDS, 2019 WL 6253269, at *6 (D. Mass. Nov. 22, 2019) ("The causation standard applicable to FMLA retaliation cases is unresolved."). Plaintiff argues that the "negative-factor" standard should apply, "under which a plaintiff need only show that her decision to take FMLA leave was a 'negative factor' in an adverse employment action." Id. (citing Chase v. United States Postal Serv., 843 F.3d 553, 559 n.2 (1st Cir. 2016)); see Pl.'s Obj. 9. Defendant contends a "but-for" test governs, which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. (quoting Chase, 843 F.3d at 559 n.2); see Def.'s Reply 4-5.

The Court takes no position on which standard should apply in this case. See Chase, 843 F.3d at 559 n.2. Rather, because Plaintiff cannot meet her burden of demonstrating pretext, as discussed in the following section, it assumes, without deciding, that Plaintiff has satisfied her burden of establishing a prima

---

further surgery, Messier testified that she did not communicate this information to Howard prior to his October 7, 2015 email. Id. ¶¶ 95, 98.

facie FMLA case.

3. Non-Discriminatory Reason and Pretext

Assuming, _arguendo_, that Plaintiff could make out a prima facie case for FMLA retaliation, the Court finds that Defendant has set forth a legitimate, non-discriminatory reason for Plaintiff's termination. Def.'s Mem. 25-28. According to Defendant, Plaintiff's position was eliminated because it was inefficient and redundant to have a Director reporting to a Group Director in a department of four people. See Def.'s SUF ¶¶ 85-86.

Consequently, the burden shifts to Plaintiff to provide evidence "from which a factfinder rationally might infer that the employer's articulated reason is a pretext for discrimination, and that the real reason for the termination was discriminatory animus." See Webber, 417 F.3d at 234. To meet this burden, a plaintiff "must offer some minimally sufficient evidence, direct or indirect, both of pretext and of [Defendant's] discriminatory animus." Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 140 (1st Cir. 2012) (emphasis in original) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991)). "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive." Mesnick, 950 F.2d at 824 (citation and quotation marks

omitted).

An inference of pretext may be drawn where a plaintiff demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" or "close temporal proximity" between the FMLA leave and adverse employment action. Hodgens, 144 F.3d at 168 (citations omitted). Furthermore, a court may look to several factors to assess discriminatory motive, including: (1) "the historical background of the . . . decision"; (2) "the specific sequence of events leading up to the challenged decision"; (3) "departures form the normal procedural sequence"; (4) "any contemporary statements by members of the decisionmaking body"; and (5) "substantive departures. . ., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." Id. at 168-69 (citations omitted).

Plaintiff contends that "a pattern of behavior" exists from which a jury could infer that Howard had a discriminatory motive when he decided to eliminate her position. Pl.'s Obj. 14. Plaintiff points to the following actions by Howard to support her argument: (1) questioning her attendance record; (2) describing Plaintiff's Second Leave as "unfortunate" in a June 10, 2014 email; (3) setting Plaintiff up in a director position only to determine months later that the job was redundant; (4) blaming Plaintiff for

Martin's resignation; (5) insisting that Messier reduce Plaintiff's performance rating on her 2014 performance evaluation; (6) holding Plaintiff accountable for inventory issues while she was on FMLA leave; and (7) arranging a "sham job offer" for a non-existent position. See id. at 18. Although the Court looks at these facts cohesively to analyze pretext, it briefly addresses each point.

First, Plaintiff claims that "Messier[] testified that Howard had asked questions about [Plaintiff's] 'excessive absenteeism' during 2014," and that this line of questioning reveals a discriminatory animus. Id. at 10. However, a review of the cited deposition testimony reveals that it was counsel, not Messier, who used the phrase "excessive absenteeism" and that Messier never even fully responded to the question in which that phrase was used. See Pl.'s Obj. Ex. EE, at 180:13-181:7, ECF No. 36-10. Moreover, the record shows that Plaintiff took at least one additional, unprotected leave of absence in October 2014 for a personal vacation. Def.'s SUF ¶ 46; Def.'s SUF Ex. I, at 27:10-28:3. Thus, even if Howard raised questions about Plaintiff's attendance in 2014, the evidence to which she has cited does not show that his questions were related to her FMLA leave, as opposed to her other absences throughout the year.

Second, Plaintiff argues that Howard's use of the word "unfortunately" in an email discussing her 2013 performance

evaluation allows for an inference of discriminatory animus. Pl.'s Obj. 14. In Howard's June 10, 2014 email, the word "unfortunately" was used to describe the fact that Plaintiff would be out of work for an additional six weeks during her Second Leave. See Def.'s SUF Ex. K, June 10, 2014 Email. As discussed supra, Plaintiff's Second Leave cannot form the basis for her FMLA retaliation claim because she had already exhausted her FMLA entitlement. Further, even if the Court reads this comment in relation to her January-May 2014 FMLA leave, it would be purely speculative to infer any causal connection between that comment and the elimination of Plaintiff's position sixteen months later, and Plaintiff has not pointed to any evidence in the record to support such an inference. See, e.g., Bennett v. Saint-Gobain Corp., 507 F.3d 23, 32 (1st Cir. 2007) ("[S]ixteen months passed between the filing of the grievance and the plaintiff's subsequent ouster. This temporal gap is sufficiently large so that, without some corroborative evidence, it will not support an inferred notion of a causal connection between the two.").

Third, Plaintiff argues Howard created the position of Director of Strategic Sourcing and moved O'Rourke into that position in December 2014 with the intention of terminating her. Pl.'s Obj. 14-15. She argues that Howard's "explanation for eliminating this job — less than a year after he created it — was that it made no sense to have the position of director — a position

he had created — on Ms. Messier's team." Id.  The First Circuit
has instructed that "[c]ourts may not sit as super personnel
departments, assessing the merits — or even the rationality — of
employers' nondiscriminatory business decisions."  Mesnick, 950
F.2d at 825; see Smith v. Stratus Computer, Inc., 40 F.3d 11, 16
(1st Cir. 1994) (stating in a Title VII discrimination case that
a plaintiff is not entitled to relief where she "has been
discharged unfairly, even by the most irrational of managers,
unless the facts and circumstances indicate that discriminatory
animus was the reason for the decision").

Fourth, Plaintiff contends that part of this pattern included
Howard "wrongly" holding her responsible for Martin's resignation.
Pl.'s Obj. 18.  However, nothing in the record connects Howard's
comments about Martin to Plaintiff's FMLA leave.  Howard discussed
Martin's abrupt resignation in the context of his questions about
Plaintiff's 2013 Performance Evaluation.  See Def.'s SUF Ex. K, at
2.  Notably, Howard also stated in that email that he "wasn't
[there] in 2013," and that he didn't "want to be unfair, and
planned to evaluate [Plaintiff's] performance over the next few
months."  Id.

Fifth, Plaintiff argues that "a jury can consider as evidence
of Howard's intent the emails questioning [Plaintiff's] rating,"
and claims that Howard "insisted" Messier reduce O'Rourke's
performance rating in the March 2, 2015 email.  Pl.'s Obj. 14, 17.

However, Howard did not eliminate Plaintiff's position because of performance issues – he eliminated her position because her Director-level status was redundant and inefficient in a group of four people. See Def.'s SUF ¶¶ 85-86; Def.'s SUF Ex. C, at 17:14-21:17. Furthermore, nothing in the record suggests that Howard challenged Plaintiff's 2014 Performance Evaluation because she took FMLA leave.

Sixth, Plaintiff points to the same March 2, 2015 email to argue that Howard held her accountable for inventory issues during her leave, which serves as evidence of animus about her exercise of FMLA rights. Pl.'s Obj. 14. Similarly, these comments relate to her performance evaluation, and Plaintiff has not pointed to specific evidence to show that these comments demonstrate animus based on her FMLA leave. See Def.'s SUF Ex. J.

Seventh, Plaintiff claims that Howard's decision to offer her the lower-level position in lieu of termination in November 2015 demonstrates pretext because "the alternative position offered to [Plaintiff] did not even exist at the time he decided to terminate her." Pl.'s Obj. 12 (citing Pl.'s Obj. Ex. W, at 119:2-6). However, this argument does not rebut Tiffany's proffered legitimate reason for eliminating Plaintiff's position – i.e., that it was inefficient to have a Director reporting to a Group Director in an operation of four people. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (stating in a Title VII

discrimination case that "a reason cannot be proved to be 'a pretext _for discrimination_' unless it is shown both that the reason was false, _and_ that discrimination was the real reason.") (emphasis in original). Tiffany did not try to hide that it was eliminating Plaintiff's position – indeed, it offered her the choice between accepting a lower-level position or accepting the standard severance package at the same time. Def.'s SUF ¶ 107. Moreover, following Plaintiff's position elimination, Tiffany did not re-add a director level position to the sourcing department. Id. ¶¶ 112-114. Thus, the fact that Tiffany offered Plaintiff a lower-level position that did not yet exist is not particularly relevant to assessing the "real reason" her position was eliminated.

The question for the Court to decide is whether these facts, considered in the light most favorable to Plaintiff, are sufficient to raise a genuine issue of material fact as to whether Plaintiff was discriminated against based on her exercise of FMLA rights. See Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 45 (1st Cir. 2002). Taking all of the evidence together, the Court finds that Plaintiff's proffered evidence does not create a dispute of fact as to whether Howard terminated Plaintiff for taking FMLA leave. Accordingly, Defendant is entitled to summary judgment on

Count II.

IV.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 34, is GRANTED as to all counts.  Judgment shall enter in favor of Defendant.


IT IS SO ORDERED.


William E. Smith
District Judge
Date:  March 27, 2020